No. 44,725

STATE OF KANSAS, *Appellee,* v. LARRY DAVIS, *Appellant.*

(427 P. 2d 606)

Opinion filed May 13, 1967.

*Dan W. Forker, Jr.,* of Hutchinson, argued the cause and was on the briefs for appellant.

*Richard J. Rome,* County Attorney, of Hutchinson, argued the cause, and *Raymond F. Berkley* and *Patrick L. Dougherty,* Assistant County Attorneys, of Hutchinson, were with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: The appellant, Larry D. Davis, was tried by a jury and found guilty of the charge alleged in the amended information that he did attempt to escape from the Kansas State Industrial Reformatory while confined at hard labor for concurrent terms of imprisonment, without being guilty of breaking such prison, contrary to K. S. A. 21-101 and 21-734. He has appealed from the judgment and sentence of fifteen years confinement in the Kansas

State Penitentiary imposed pursuant to the Habitual Criminal Act (K. S. A. 21-107a), and the order overruling his motion for a new trial.

It is first contended the state's evidence was insufficient to sustain the verdict finding the defendant guilty of an attempt to escape, and that the district court erred in overruling his motion for a directed verdict.

The evidence showed that on November 10, 1965, the appellant was confined in the Kansas State Industrial Reformatory at Hutchinson. He was serving two sentences from Graham County and was also serving a sentence from Russell County. On the same day, Davis and his cell mate, Joe Barnett, were present and accounted for at the 8:00 o'clock a. m. head count in cell house No. 2 in the reformatory. Three and a half hours later, at 11:30 a. m., the two boys failed to appear for the head count and were unaccounted for by the correction officer. An immediate search of the reformatory followed but the two boys could not be found. The search continued into the afternoon, through the night, and into the early part of the next day, November 11, 1965. Between 1:00 and 1:30 p. m. on November 11, 1965, over 24 hours after the boys were first reported missing, the recreational director was checking the reformatory softball diamond to see if it was too wet to have some of the inmates out on the yard—it had rained the day before. As he walked by the officers' guard stand located near the batter's box on the baseball diamond, he heard mumbling noises and water sloshing, and he knew someone was below the floor. The guard stand was approximately 4x4 feet with approximately 2½ feet between the floor and the ground level inside the stand so there was space for at least two men to hide under the floor. The floor was constructed of grooved or tongue-lapped flooring with the boards interlocking each other, which were solidly nailed down. The entire baseball field, including the guard stand, is within the confines of the walls of the reformatory.

The recreational officer noted the flooring appeared to be lightly nailed down and he tried to raise it with his hands, but it had been sawed closely along the edge and he could not raise it. He called for his assistant to bring a crowbar to lift the flooring. When the floor was pried up, Davis and Barnett were hiding in the space below and they were asked to come out, which they did. Both boys were wet and hungry and the recreational director took them

into cell house No. 1, gave them a bath, clean clothes and a hot meal, and had them ready to be interviewed by the superintendent. In "shaking down" the clothing of Davis and Barnett, a case knife and a file were found in one of the wet jackets. Later that afternoon an officer of the reformatory searched the space below the floor of the stand. He found two belts; two files, a long thin one about one inch wide and a long round one; a box of matches, and a pair of gloves.

As indicated, the charge was that the defendant attempted to escape lawful confinement from the reformatory. The charge was based upon the assumption our statutes make an actual escape from the Industrial Reformatory a crime (*Henderson v. State*, 198 Kan. 655, 426 P. 2d 92); and that an attempt to commit the offense was made unlawful by K. S. A. 21-101. Our statutes relating to the administration of justice do not define the term "escape." It has been held that statutes enacted covering escape have been considered declaratory of, and supplementary to, the common law. (30A C. J. S. Escape, § 2, p. 875.) At the common law, the crime of "escape" was committed by a prisoner when he voluntarily departed from lawful custody without breach of prison. (30A C. J. S. Escape, § 2, p. 876.) To constitute an escape on the part of the prisoner there must be lawful custody and an actual departure from the place of confinement whereby he unlawfully gains his liberty. (*State v. Beebe*, 13 Kan. *589, 19 Am. Rep. 93; 27 Am. Jur. 2d, Escape, Prison Breaking and Rescue, § 1, p. 848; 30A C. J. S. Escape, §§ 2-6, pp. 875-886.) The use of force or violence is not a necessary element of an escape (30A C. J. S. Escape, § 2b, p. 877), and an escape is distinguished from prison break by this circumstance. (*State v. Clark*, 121 Kan. 817, 250 Pac. 300, 50 A. L. R. 986; *State v. McGrew*, 190 Kan. 834, 378 P. 2d 94, 96 A. L. R. 2d 517.)

An attempt to escape is a substantive crime and is such effort on the part of the prisoner to depart from lawful custody before discharge by due process of law as would, if not extraneously interrupted, end in the consummation of an escape. (27 Am. Jur. 2d, Escape, Prison Breaking and Rescue, § 4, p. 851; 30A C. J. S. Escape, §§ 8-12, pp. 886-888.) An attempt to commit a crime is an act done with intent to commit that crime, and forming a part of a series of acts which would constitute its actual commission if it were not interrupted. All acts done in preparation are, in a sense, acts done toward the accomplishment of the thing contemplated. K. S. A.

21-101 was construed and applied in *State v. Bereman*, 177 Kan. 141, 276 P. 2d 364 (then G. S. 1949, 21-101), where it was said:

"It may be generally stated that an attempt to commit a crime consists of three elements: (1) the intent to commit the crime; (2) performance of some act toward the commission of the crime, and (3) the failure to consummate its commission.

"In order that there may be an attempt to commit a crime, whether statutory or at common law, there must be some overt act in part execution of the intent to commit the crime. The act must reach far enough toward the accomplishment of the desired result to amount to the commencement of the consummation. It must not be merely preparatory, and it need not be the last proximate act to the consummation of the offense attempted to be perpetrated. However, it must approach sufficiently near to it to stand either as the first or some subsequent step in a direct movement toward the commission of the offense after the preparation or solicitation is made. Slight acts done in furtherance of that design will constitute an attempt. No definite rule can be laid down by which an act might be characterized as overt in any particular case. The general principle of law concerning attempts must be applied in each case as nearly as it can with a view to substantial justice. (22 C. J. S. 139, 140, § 75; 14 Am. Jur. 816, § 68.)" (l. c. 142, 143.)

See, also, *State v. Frazier*, 53 Kan. 87, 90, 36 Pac. 58; *State v. Bowles*, 70 Kan. 821, 79 Pac. 726, and *State v. Custer*, 85 Kan. 445, 446, 116 Pac. 507; 1 Wharton's Criminal Law and Procedure, Ch. 6, §§ 21-74.

The evidence introduced by the state has been narrated. It showed that the defendant was lawfully confined in the reformatory pursuant to concurrent terms of confinement imposed by courts of competent jurisdiction, which had not expired; that the defendant and his cell mate were present at the head count at 8:00 a. m. on November 10, 1965, but were not present at the 11:30 a. m. head count; that a search for their whereabouts ensued and continued for more than 24 hours throughout the reformatory and grounds; that the defendant was found hiding underneath the wooden floor of the guard stand inside the reformatory, which flooring had been replaced to avoid detection by the officials and to conceal the defendant while awaiting an opportunity to complete his escape. We think there was a basis in the evidence for a reasonable inference of guilt and was sufficient to warrant a conviction for an attempt to commit an escape. In *State v. Scoggins*, 199 Kan. 108, 427 P. 2d 603, it was said:

"In a criminal prosecution it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before a verdict of a jury which has been approved by the trial court may be set aside on appeal on the ground of insufficiency of evidence, it

must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the trial court. (*State v. Walker,* 198 Kan. 14, 422 P. 2d 565, Syl. ¶ 1; *State v. Shaw,* 195 Kan. 677, 408 P. 2d 650; *State v. Gregory,* 191 Kan. 687, 383 P. 2d 965; and *State v. Ledbetter,* 183 Kan. 302, 327 P. 2d 1039.)"  (l. c. 111.)

See, also, *State v. Crosby,* 182 Kan. 677, 342 P. 2d 197, 76 A. L. R. 2d 514, and authorities cited therein at page 685.

The defendant argues the district court erred in admitting into evidence improperly authenticated copies of his prior convictions and commitments to establish his lawful confinement in the reformatory. It is urged that the authentication by the clerk of the district court of the journal entry of the defendant's conviction in the district court of Graham County and his commitment to the reformatory did not meet the requirements of K. S. A. 60-465. The point is not well taken. This court has held that certified copies of the records of commitment of a prisoner kept by state penal institutions as authorized or required by law are admissible in evidence to prove lawful confinement. (*State v. Hall,* 187 Kan. 323, 356 P. 2d 678; *State v. Loyd,* 187 Kan. 325, 356 P. 2d 825.)  Furthermore, the authentication of the records of confinement introduced in evidence fully complied with K. S. A. 60-465 (2) and (3).

The defendant contends he was denied a fair trial because the state placed a witness on the stand without having endorsed his name in the information. The county attorney acted in violation of K. S. A. 62-802 and was guilty of official neglect of duty in calling the witness Hurst without having endorsed his name on the information. Such conduct is inexcusable and is in complete disregard of our established rules of procedure in criminal cases, but the question is whether the error was so prejudicial as to deny the defendant a fair trial. The state called the recreational director who testified at length of finding the defendant and his cell mate concealed beneath the floor of the guard stand. His name had been endorsed on the information. Later, the state called witness Hurst, the recreational director's assistant, who testified briefly concerning the location of the guard stand; that he supervised the crew which took up the flooring and filled the space below with sand and concrete to make a solid floor, all of which was merely cumulative of the testimony previously given by the recreational director. At this point, counsel for the defendant discovered Hurst's name was not endorsed on the information and moved that all his testimony be

stricken. After conference at the bench between court and counsel, the following occurred:

"THE COURT: Any testimony introduced through the assistance of Mr. Hurst will be stricken from the record."

We are of the opinion that, under the circumstances, any error which may have occurred did not prejudice the substantial rights of the defendant and did not deny him a fair trial.

It is next contended the defendant was deprived of a fair trial because of adverse and unfair publicity accorded him as a result of an alleged crime committed by him during the trial. The record indicates that counsel for the defendant made a statement to the court out of the presence and hearing of the jury to the effect that there was widespread newspaper and radio coverage concerning the defendant's attempt to escape from the county jail where he was confined while the trial was in progress. It is argued the publicity of the news media resulted in evidence being placed before the jury concerning a subsequent offense on his part which would have not been otherwise admissible, and deprived the defendant of a fair trial. Counsel stated to the district court he did not feel the defendant had grounds for mistrial at that time because he did not have any way of knowing how the publicity might affect the jury. He requested the court to admonish the jury, but stated, "I hate to have them admonished, because it brings it to their attention, but to protect our clients, I think it should be done." In ruling upon the matter, the court stated:

"The very first thing to disabuse counsel's mind is that the Court did not listen to the radio or read the newspaper accounts. At least on five occasions I admonished this jury not to listen to the radio accounts and not to read the newspaper accounts. Now, you have great faith in the jury system, and I think any statement by me would be a personal affront to this jury, and until such time as somebody brings some evidence in here to the contrary, I am going to assume that the jury system does work, that they obey the mandate of the Court, and that they will give these gentlemen a fair trial. I can understand counsel's concern, and I am aware of some talking around about some of these reports. I have not listened to any of them and I have not read any newspaper accounts. I am sure this jury is honest and I am sure they will follow the Court's instructions."

At the hearing on the motion for a new trial, counsel produced no evidence of misconduct on the part of any juror. We must assume no such evidence was available, and that the jurors heeded the admonitions of the district court. The defendant carries the

burden of making it affirmatively appear that error was committed below, and on this point he has failed to sustain that burden. See, *Kincaid v. Wade,* 196 Kan. 174, 410 P. 2d 333.

Other matters have been raised, particularly that the district court erred in overruling the defendant's motion for a new trial. The points urged have been fully discussed and decided adversely to the defendant. We have carefully reviewed the record and are of the opinion the district court did not err in overruling the defendant's motion for a directed verdict; in approving the jury's verdict, and in overruling the motion for a new trial.

The judgment is affirmed.